SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Steven L. Bookman** (A-32-21) (085775)

**Argued April 25, 2022 -- Decided August 24, 2022**

**FUENTES, P.J.A.D. (temporarily assigned), writing for a unanimous Court.**

In this appeal, this Court reviews the time, place, and manner in which the New Jersey State Police executed an arrest warrant, issued by the Deptford Township Municipal Court under the Automated Traffic System (ATS), for failure to appear in response to a motor vehicle violation. The Court also considers defendant Steven L. Bookman's argument that the Court should adopt a bright-line rule providing that an ATS warrant is not sufficient to justify the warrantless entry of a home under the hot pursuit doctrine.

Julian Bell was the subject of "a long-term investigation" for theft. On the evening of November 1, 2017, State Police received a tip that Bell was outside his residence engaged in an apparent drug transaction. The police did not have, or attempt to obtain, a warrant to detain Bell on the alleged narcotics transaction. The sole legal ground to arrest Bell was based upon an ATS warrant, issued by a municipal court on June 29, 2017, for failure to respond to a summons charging him with driving with a suspended driver's license. Eight officers deployed to the scene at around 1:00 a.m. on November 2. Bell and Bookman were standing outside when the officers arrived; they ran into a neighboring home with officers in pursuit. One officer found Bookman laying face down on the floor with his arms outstretched.

The officer who found Bookman testified that he frisked Bookman and asked whether he had any weapons; Bookman told the officer about a knife and gun in his pockets, which the officer retrieved. Bookman was found guilty of one weapon possession charge for the gun.

Bookman argued on appeal that the officers' entry into the residence was not justified by the hot pursuit exception to the warrant requirement. The appellate court noted the officers acted pursuant to a valid arrest warrant and were thus justified to pursue Bell into a private residence. The Appellate Division declined to distinguish between an arrest warrant issued by a judge for a criminal offense codified under Title 2C and an ATS warrant issued by a municipal court judge. The Court granted certification. 249 N.J. 91 (2021).

**HELD:** Under the totality of the circumstances reviewed here, the State Police detectives who entered the neighboring residence without a warrant did not have grounds to invoke the hot pursuit doctrine. The warrantless entry violated the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution. Although the Court is disturbed by the manner of execution of this warrant, it declines to adopt a rigid, one-size-fits-all approach to the execution of all ATS arrest warrants.

1. The Court discusses the process by and offenses for which ATS warrants can be issued. Arrest warrants for Title 39 violations require a finding of probable cause by a judicial officer as defined in Rule 7:2-1(d)(1). (pp. 12-13)

2. Law enforcement officers have a duty to enforce validly issued arrest warrants without distinction, whether they were issued for minor or serious offenses. New Jersey follows the United States Supreme Court's precedent that an arrest warrant implicitly carries with it the limited authority to enter a dwelling where the suspect lives when there is reason to believe the suspect is inside. However, to search for the subject of an arrest warrant in the home of a third party, the police must also obtain a search warrant absent exigent circumstances or consent. In light of state and federal constitutional guarantees of the right to privacy, warrantless entries into the home are presumptively invalid unless the State can show that one of the exceptions to the warrant requirement applies. Evidence found pursuant to a warrantless search not justified by an exception to the warrant requirement is subject to suppression. (pp. 13-15)

3. One exception to the warrant requirement is the presence of exigent circumstances, including the "hot pursuit" doctrine under which a warrantless entry may be justified to prevent the possible destruction of evidence and the threat of violence by the suspect. Whether there are sufficient exigent circumstances to justify a warrantless entry into a third party's home is a fact-sensitive inquiry. Specifically, courts must consider whether, under the totality of the circumstances, the entry was objectively justified. (pp. 15-16)

4. To determine whether the totality of the circumstances in this case justified the officers' hot pursuit into a third-party residence to execute an ATS warrant to arrest Bell, the Court considers guidance from case law as to factors particularly relevant to such a totality-of-the-circumstances inquiry. In Welsh v. Wisconsin, the United States Supreme Court explained that, "[b]efore agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." 466 U.S. 740, 750 (1984). The Court stated that, "[w]hen the government's interest is only to arrest for a minor offense, that presumption of unreasonableness is difficult to rebut." Ibid. In Lange v. California,

2

the Supreme Court noted that, even when suspect flees, "[w]hen the nature of the crime, the nature of the flight, and surrounding facts present no . . . exigency, officers . . . must get a warrant."  141 S. Ct. 2011, 2021-22 (2021).  The New Jersey Supreme Court reached a similar conclusion in State v. Bolte, 115 N.J. 579, 581(1989), and recently relied upon the principles endorsed in Bolte in finding that warrantless entry upon spotting a stolen phone case through the window of a residence was not justified under either hot pursuit or any other exigent circumstances because the police had no "basis to believe that defendant would injure anyone inside the house or the officers themselves, [such] that waiting to obtain a warrant would have been unreasonable."  State in Int. of J.A., 233 N.J. 432, 451 (2018).  (pp. 16-23)

5.  Here, the State Police officers were not entitled to enter the neighboring residence under the hot pursuit doctrine.  The ATS warrant only authorized Bell's arrest and the entry of his home, if necessary; it did not authorize officers to pursue Bookman into the neighboring home, and Bookman's decision to run from the scene did not constitute grounds to invoke the hot pursuit doctrine.  In this case, the officers knew that the ATS warrant was for a minor traffic offense and had no reason to suspect there was any risk of danger or destruction of evidence relevant to that warrant that may have justified a hot pursuit.  Unlike in State v. Jones, 143 N.J. 4 (1995), the State Police here encountered Bell and Bookman based on a planned execution of the ATS warrant, and any exigency was a direct result of the officers' decision to unreasonably execute the ATS warrant.  The Court notes that the leader of the police team (1) selected an unreasonable time of the day to execute the warrant (1:00 a.m. in a residential neighborhood); (2) deployed an unreasonable number of officers -- eight -- to execute the traffic warrant arrest; (3) unreasonably pursued Bookman, a man who was neither named on the ATS warrant nor suspected of being involved in any criminal activity; and (4) unreasonably entered the home of a third party without a warrant.  Law enforcement officers cannot create the exigencies they later use to undermine the sanctity of one's home.  The State failed to meet its burden to prove that the officers' actions were objectively reasonable under the hot pursuit doctrine.  The Court rejects the State's invocation of "high crime area" as a relevant factor in this case.  The State did not present competent evidence illustrating that the relevant area was in fact within a "high crime area." (pp. 23-28)

**REVERSED.  Defendant's conviction is VACATED.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, and PIERRE-LOUIS join in JUDGE FUENTES's opinion.**

3

State of New Jersey,

Plaintiff-Respondent,

v.

Steven L. Bookman,
a/k/a Steven Bookman,
Lamont Bookman, Shaw Forrest,
Shawn Forrest, and Steven Sharp,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
| --- | --- |
| April 25, 2022 | August 24, 2022 |

Jennifer A. Randolph, Designated Counsel, argued the
cause for appellant (Joseph E. Krakora, Public Defender,
attorney; Jennifer A. Randolph and Michael J. Hampson,
on the briefs).

Sarah D. Brigham, Deputy Attorney General, argued the
cause for respondent (Matthew J. Platkin, Acting
Attorney General, attorney; Sarah D. Brigham, of counsel
and on the briefs).

Alexander Shalom argued the cause for amicus curiae
American Civil Liberties Union of New Jersey (American
Civil Liberties Union of New Jersey Foundation,

attorneys; Alexander Shalom and Jeanne LoCicero, on the brief).

Lee D. Vartan argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Chiesa Shahinian & Giantomasi, attorneys; Lee D. Vartan and Brittany A. Manna, on the brief).

JUDGE FUENTES (temporarily assigned)
delivered the opinion of the Court.

In this appeal, this Court reviews the time, place, and manner in which the New Jersey State Police executed an arrest warrant, issued by the Deptford Township Municipal Court under the Automated Traffic System (ATS), for failure to appear in response to a Title 39 violation.

Sometime after 1:00 a.m. on November 2, 2017, State Police officers were deployed to arrest Julian Bell on a four-month-old failure to appear warrant. When the officers arrived at Bell's home, he was standing outside with defendant Steven Bookman. Bell and Bookman fled into a row house next door to Bell's residence, and officers pursued Bookman to a second-floor bedroom. After an officer informed Bookman he did not have legal grounds to detain him, Bookman voluntarily told the officer he had a revolver inside his jacket pocket. The officer retrieved the handgun and arrested Bookman.

Following his indictment for weapons offenses, Bookman moved to suppress the handgun based on the warrantless entry into the row house.

Relying on this Court's decision in State v. Jones, 143 N.J. 4 (1995), the judge denied the motion, finding that the State Police officers were permitted to enter the residence without a warrant under the hot pursuit doctrine.

The Appellate Division also relied on Jones to affirm the trial court's decision denying Bookman's motion to suppress. Bookman now urges this Court to adopt a bright-line rule providing that an ATS warrant is not sufficient to justify the warrantless entry of a home under the hot pursuit doctrine.

This Court has recognized that certain exigent circumstances may justify the warrantless entry of a home, such as preventing the "imminent destruction of vital evidence" in an ongoing criminal investigation; protecting against a threat of violence from a suspect who flees into a dwelling; or aiding a person who is in objectively reasonable distress. See State v. Vargas, 213 N.J. 301, 324 n.9 (2013). For reasons we explain below, none of these well-settled exceptions to the warrant requirement are applicable here.

We thus reverse the Appellate Division and suppress the handgun the State Police retrieved from Bookman. Although we are disturbed by the manner of execution of this warrant, we decline to adopt a rigid, one-size-fits-all approach to the execution of all ATS arrest warrants because interactions

between police officers and the public are inherently unpredictable and may give rise to tragic consequences.

I.

A.

Bell was the subject of "a long-term investigation" by the State Police, who suspected Bell was connected with the theft of motorcycles and all-terrain vehicles (ATVs) in the City of Camden. On the evening of November 1, 2017, State Police Detective Jorge A. Rivera, the leader of the investigation, received "information" that Bell was "observed" standing in front of his residence, "along with a few other males," "conducting a hand-to-hand transaction" of what was "suspected" to be "crack cocaine." It is undisputed, however, that Rivera did not have, or attempt to obtain, a warrant to detain Bell on the alleged narcotics transaction. The sole legal ground Rivera had to arrest Bell was based upon an ATS warrant, issued by a municipal court on June 29, 2017, for failure to respond to a summons charging him with driving with a suspended driver's license, in violation of N.J.S.A. 39:3-40.

At approximately 1:00 a.m. on November 2, 2017, Rivera "had a briefing" with the seven other officers planning to arrest Bell in connection with this outstanding ATS warrant. The officers' only mission was to arrest Bell. Thurman Street consists of a succession of closely aligned row houses;

4

Bell resided at 1235 Thurman, less than two feet from 1237 Thurman. The "arrest team" deployed to cover the front and rear area of Bell's residence.

Bell and defendant Bookman were standing in front of Bell's residence when the officers arrived. State Police Detective Sergeant Timothy Steinmetz was part of the arrest team and had police identifiers across his chest. He recognized Bell as soon as he exited his car and yelled, "Stop, State Police."

Bell and Bookman ran into 1237 Thurman Street, the row house immediately next to Bell's residence. Detective DeVirgilis, one of the officers who pursued Bookman and Bell, entered 1237 Thurman Street and found Bookman in a second-floor bedroom "proned out" on the floor in a "safety position" -- face down with his arms outstretched. At the suppression hearing, DeVirgilis candidly testified that they "were looking" for Bell because he was "a suspect [in a] stolen motorcycle investigation" and knew he had "an outstanding ATS warrant out of Deptford Township."

Although Bookman was lying prone on the floor and not exhibiting any hostility, DeVirgilis testified that "the black male was . . . proned out so he wasn't in handcuffs. So I, immediately, knew that I had to secure him in handcuffs for all of our safety." The prosecutor asked DeVirgilis to describe what occurred next.

> Q: Did you ask him any questions at that time?

A: I did. I asked him who he was. He identified himself as Steven Bookman. I asked him if he lived here. He said, no he didn't . . . . And then I, also, asked him if he had any weapons on him that may hurt me. He said he had a knife on him. I looked and saw in his front left pocket . . . a knife clipped to that pocket. And I, immediately, for trooper safety/officer safety, I removed that knife and threw it to this side of the bedroom.

Q: After you removed the knife what did you do next?

A: Now finding a knife on him and also him telling me that he didn't live in that house I then conducted a protective frisk for my safety of his outer clothing for weapons. And then when I continued down that left front pocket[,] I felt a bulge and I could see it. I asked him to identify it, and he volunteered that it was cigarettes, a lighter and keys. Knowing that those items could be considered weapons, . . . I entered his pocket and I removed all three items and, again, threw them to the side of the room.

Q: Did you continue the frisk after that?

A: I did. And as I was continuing the frisk I said to . . . Mr. Bookman, . . . you're not the person we are looking for -- wrong place, wrong time. And, I said, you're probably going to be released. And he goes, "No, you're not." And I said, "What are you talking about?" And he goes, "Cause I have a gun in my front jacket pocket." . . . And I said, "Why didn't you tell me that before you told me about the knife?" So I went to the jacket pocket -- and it was the right front -- and I put my hand on it to frisk it and I, immediately, felt the butt of a handgun because it was hard -- I unzipped the

6

pocket and pulled out a revolver. And then I handed that revolver over to Trooper Cocking to render it safe.

## B.

Bookman was indicted for unlawful possession of a handgun (count one) and unlawful possession of a handgun by a person previously convicted of one of the offenses listed in N.J.S.A. 2C:39-7(b) (count two). Bookman moved to suppress the handgun. Based on the hot pursuit doctrine, the judge denied the motion finding that the officers were justified in pursuing Bell and Bookman into 1237 because "[t]here was a high degree of urgency considering the target of the investigation . . . was actively fleeing. It would've been impractical to obtain a warrant to allow a search of the property at that time."

The judge dismissed the unlawful possession of a handgun charge, and the case proceeded to trial on count two. The jury found Bookman guilty, and the trial judge sentenced him to a term of eight years with a mandatory five-year period of parole ineligibility under N.J.S.A. 2C:39-7(b)(1).

## C.

Bookman argued to the Appellate Division, among other claims, that the State Police officers' entry into the 1237 Thurman Street residence was not justified by the hot pursuit exception to the warrant requirement. Relying on this Court's decision in Jones, the Appellate Division rejected Bookman's argument. The appellate court noted the officers acted pursuant to a valid

7

arrest warrant and were thus justified to pursue Bell into a private residence. The Appellate Division declined to distinguish between an arrest warrant issued by a judge for a criminal offense codified under Title 2C and an ATS warrant issued by a municipal court judge, in this case for Bell's failure to appear in response to driving with a suspended driver's license.

D.

This Court granted defendant's petition for certification. 249 N.J. 91 (2021). We also granted leave to appear as amici curiae to the Association of Criminal Defense Lawyers of New Jersey (ACDL) and the American Civil Liberties Union of New Jersey (ACLU).

II.

A.

Defendant urges this Court to reverse the Appellate Division's decision and hold that an ATS warrant, on its own, is not sufficient to justify the warrantless entry of a third-party's home under the hot pursuit doctrine. Defendant argues the Appellate Division erroneously expanded this Court's holding in Jones because the only "exigency" the State relied on in this case was a four-month-old ATS warrant on Bell for failure to appear for an alleged traffic violation. Bookman also argues that the actions taken by the officers here were inconsistent with the United States Supreme Court's recent decision

8

in <u>Lange v. California</u>, ___ U.S. ___, 141 S. Ct. 2011, 2016 (2021), because a traffic warrant presents no exigencies.

Finally, Bookman stresses that the police must always act "in an objectively reasonable manner," and argues that it was unreasonable for the officers to execute a four-month-old traffic warrant at 1:00 a.m. (quoting <u>Jones</u>, 143 N.J. at 19-20). The officers did not run into Bell on the street by chance, Bookman argues, but rather were monitoring his conduct throughout the day and chose to execute the traffic warrant in the early morning hours with "the hope[] of using that arrest in furtherance of a separate investigation."

B.

Amicus ACDL asserts that the two exigent circumstances that could have justified a home entry were not present here: There was no evidence relevant to the ATS warrant to destroy, and "threats of violence cannot be said to attach to traffic offenses, which are not even crimes under New Jersey law." The ACDL contends the Appellate Division misapplied this Court's decision in <u>Jones</u> and did not consider facts distinguishing this case from <u>Jones</u>.

Amicus ACLU argues that <u>Jones</u> did not create a per se rule and maintained that the relevant test is whether officers acted in an objectively reasonable manner. The ACLU notes this Court predicted "there [would not] be a flood of police routinely entering residences by force to effectuate arrest

9

warrants for minor matters." (quoting Jones, 143 N.J. at 19). The ACLU asserts that to justify a hot pursuit entry into a private home, exigent circumstances must be present -- "fear of destruction of evidence or the threat of violence." Because neither of those concerns were present here, the ACLU concludes the State cannot justify the detectives' warrantless entry in 1237 Thurman Street.[1]

## C.

The State contends that the officers lawfully entered 1237 Thurman Street in hot pursuit of Bell, "the subject of an arrest warrant who sought to evade apprehension by fleeing into another's home." The State stresses that the United States Supreme Court decision in Lange did not disturb this Court's long-standing precedent that officers may pursue a fleeing subject of a valid arrest warrant into a private residence.

The State explains that unlike in Jones and here, the officer in Lange did not have a judicially authorized arrest warrant. Therefore, according to the State, the Lange Court's holding, which requires a totality of the circumstances analysis to determine whether the pursuit of a misdemeanor subject without a warrant is lawful, does not apply to the present case.

---

[1] We decline to address issues presented by the ACLU that were not raised by defendant. See, e.g., State v. Rivas, 251 N.J. 132, 151 n.6 (2022).

The State emphasizes that arrest warrants do not only permit hot pursuit entries into the subject's home, but also to third-party residences. According to the State, a rule limiting hot pursuit strictly to the subject's home would be an unreasonable limitation. Whether an arrest warrant is for a minor or serious offense, the State argues, "does not change an officer's 'duty to enforce validly issued arrest warrants without distinction'" (quoting Jones, 143 N.J. at 17), because offenses labeled "petty" or "minor" do not necessarily mean the subject does not pose a danger to the officers or society, and officers are not always able to determine what the offense underlying an arrest warrant is on the ATS database accessible from their cars. Further, the State notes Bookman was in a "high-crime area" at the time of the warrant's execution. Thus, the State maintains that under the totality of the circumstances, the actions of the officers here were reasonable.

### III.

"An appellate court reviewing a motion to suppress evidence must uphold the factual findings underlying the trial court's decision, so long as those findings are 'supported by sufficient credible evidence in the record.'" State v. Evans, 235 N.J. 125, 133 (2018) (quoting State v. Elders, 192 N.J. 224, 243 (2007)). A motion court's findings should not be disturbed unless "they are so clearly mistaken 'that the interests of justice demand intervention

11

and correction.'" Ibid. (quoting Elders, 192 N.J. at 243). This Court, however, "owe[s] no deference to conclusions of law reached by the motion court or Appellate Division, which we review de novo." Ibid.

A.

1.

New Jersey's ATS "is the statewide computer system utilized by all municipal courts in the state." Admin. Off. of the Cts., Information Technology Office's Access Guide to the ATS Database 2 (2011). The database contains all traffic tickets filed in the municipal courts and is available to all law enforcement agencies in the state. Ibid. The ATS inquiry system is designed for remote users to access traffic ticket and warrant information, including "violations, sentences, payments, bail and warrant information when applicable." Ibid. The ATS database plays an important role in the enforcement of New Jersey's motor vehicle laws, codified by the Legislature in Title 39.

The issuance of an ATS warrant in connection to a pending Title 39 case is the responsibility of the Judiciary under the Rules established by this Court. Driving with a suspended license is prohibited by N.J.S.A. 39:3-40. Rule 7:2-2(h) provides that "[i]f a defendant who has been served with a summons fails to appear on the return date, a bench warrant may issue pursuant to law and

12

Rule 7:8-9." Arrest warrants for violating a Title 39 offense must follow the procedures set forth in Rule 7:2-1(d)(1), which requires the complaint "be signed by a judicial officer after a determination of probable cause that an offense was committed and that the defendant committed it." A judicial officer "is defined as a judge, authorized municipal court administrator or deputy municipal court administrator." R. 7:2-1(d)(1).

This Court has held that judicial officials are qualified to make the finding of probable cause required for an arrest warrant because the standard "is designed to be applied by laymen" based on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." State v. Ruotolo, 52 N.J. 508, 512-15 (1968) (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)). We also noted that judicial officials are "independent of any agency charged with the apprehension and prosecution of offenders." Id. at 512.

## 2.

"Law enforcement officers have a duty to enforce validly issued arrest warrants without distinction, whether they were issued for minor or serious offenses." Jones, 143 N.J. at 17. When there is a warrant out for a person's arrest, even if that warrant is "only for the failure to pay an outstanding traffic fine," an officer is required to arrest the individual "regardless of the reason

13

and [does] not have to investigate the nature of the charge." Evans, 235 N.J. at 139.

This Court follows the United States Supreme Court's precedent that "[a]n arrest warrant 'implicitly carries with it the limited authority to enter a dwelling' where the suspect lives when there is reason to believe the suspect is inside." State v. Brown, 205 N.J. 133, 145 (2011) (quoting Payton v. New York, 445 U.S. 573, 603 (1980)). However, "[t]o search for the subject of an arrest warrant in the home of a third party, the police must also obtain a search warrant . . . absent exigent circumstances or consent." Ibid.

"The Fourth Amendment of the United States Constitution and Article 1, Paragraph 7 of the New Jersey Constitution both safeguard the right to privacy and forbid warrantless entry into a home except under certain circumstances." State in Int. of J.A., 233 N.J. 432, 446 (2018). Therefore, warrantless entries into the home are presumptively invalid unless the State can show that one of the exceptions to the warrant requirement applies. Ibid. "Courts subject warrantless entries to 'particularly careful scrutiny,' and 'only in extraordinary circumstances may . . . [such entries] be justified.'" Ibid. (omission and alteration in original) (quoting State v. Bolte, 115 N.J. 579, 583-84 (1989)). Evidence found pursuant to a warrantless search not justified by an exception to the warrant requirement is subject to suppression. Ibid.

14

One "exception to the warrant requirement is the presence of exigent circumstances." Id. at 448. The State must show that the police "had probable cause and faced an objective exigency." Ibid. The hot pursuit of a fleeing suspect may constitute an exigent circumstance sufficient to justify a warrantless home entry if the officers are in "immediate or continuous pursuit" of the suspect. Bolte, 115 N.J. at 597-98; see also J.A., 233 N.J. at 449 (noting the United States Supreme "Court's longstanding recognition that '"hot pursuit" cases fall within the exigent-circumstances exception to the warrant requirement'" (quoting Steagald v. United States, 451 U.S. 204, 218 (1981)). "Because the 'hot pursuit' doctrine is a subset of the exigent-circumstances exception to the warrant requirement, the touchstones that would justify a warrantless entry remain the possible destruction of evidence and the threat of violence by the suspect." J.A., 233 N.J. at 449 (citations omitted).

Whether there are sufficient exigent circumstances to justify a warrantless entry into a third party's home is a fact-sensitive inquiry. See id. at 448. Specifically, courts must consider whether, under the totality of the circumstances, the entry was objectively justified. Ibid. "The proper focus of that inquiry is on the conduct of the officers and not their subjective intent. An action is reasonable 'regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify [the] action.'" Brown,

15

205 N.J. at 146 (alteration in original) (quoting State v. O'Neal, 190 N.J. 601, 613-14 (2007)).

3.

In this case, we must determine whether the totality of the circumstances justified the officers' hot pursuit into a third-party residence to execute an ATS warrant to arrest Bell. Case law provides guidance as to factors particularly relevant to such a totality-of-the-circumstances inquiry.

In Welsh v. Wisconsin, the United States Supreme Court held "that an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." 466 U.S. 740, 753 (1984). In Welsh, police responded to a call regarding a suspected drunk driver. Id. at 742. Welsh had abandoned his vehicle by the time the police officers arrived at the scene and entered his home. Id. at 742-43. The officers entered the house without a warrant and arrested Welsh. Ibid.

The State attempted to justify the warrantless entry into the home by using the hot pursuit exception. Id. at 753. However, the Supreme Court held "the claim of hot pursuit [was] unconvincing because there was no immediate or continuous pursuit of the petitioner from the scene of a crime." Ibid. The Court noted that the warrantless entry was unlawful because Welsh was

16

charged with only a "nonjailable" minor offense, insufficient to justify any exigency. Id. at 742-43, 754. Lastly, the Court explained that

> hesitation in finding exigent circumstances, especially when warrantless arrests in the home are at issue, is particularly appropriate when the underlying offense for which there is probable cause to arrest is relatively minor. Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries. When the government's interest is only to arrest for a minor offense, that presumption of unreasonableness is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate.
>
> [Id. at 750 (footnote and citation omitted).]

In June 2021, the United States Supreme Court decided Lange, in which it addressed situations that may justify the warrantless entry of a home under the hot pursuit doctrine. 141 S. Ct. at 2021. In Lange, a man drove past a police officer while blaring loud music and repeatedly honking his horn. Id. at 2016. The officer activated the patrol car's overhead lights to signal the driver to pull over; by that point, however, the driver was approximately a hundred feet from his home. Ibid. Rather than pull over, he drove into his attached garage; the police officer followed him and began questioning him. Ibid. The

17

State later "charged [the driver] with the misdemeanor [offense] of driving under the influence of alcohol, plus a (lower-level) noise level infraction." Ibid.

> the need to pursue a misdemeanant does not trigger a categorical rule allowing home entry, even absent a law enforcement emergency. When the nature of the crime, the nature of the flight, and surrounding facts present no such exigency, officers must respect the sanctity of the home -- which means that they must get a warrant.
>
> [Id. at 2021-22.]

Stated differently, whether pursuing an apparently intoxicated driver justifies the warrantless entry of his home under the hot pursuit doctrine requires a fact-sensitive, case-by-case assessment of "the exigencies arising from [the] misdemeanant['s] flight." Id. at 2021.

The Court in Lange noted that, although some nonindictable offenses may be inherently violent, thus justifying a warrantless entry of a home under the hot pursuit doctrine, "no evidence suggests that every case of misdemeanor flight poses such dangers." Ibid. The Court explained that "[w]hen the totality of the circumstances shows an emergency -- such as imminent harm to others, a threat to the officer himself, destruction of evidence, or escape from the home -- the police may act without waiting. And those circumstances . . . include the flight itself." Ibid. (emphasis added). When none of these

18

exigencies are present, however, police officers must wait to obtain a warrant issued by an impartial magistrate <u>even if the misdemeanant fled</u>. <u>Id.</u> at 2024.

This Court reached a similar conclusion in <u>Bolte</u>. In that case, a police officer observed the defendant driving erratically and trailing another car for approximately one mile until he reached his residence. 115 N.J. at 581. "The officer followed him into the garage, then into the house and upstairs to the bedroom door," where he arrested the defendant. <u>Ibid.</u> The officer charged the defendant with both Title 39 motor vehicle offenses and disorderly persons offenses under Title 2C. The State argued the officer's warrantless entry into the defendant's residence was justified under the hot pursuit doctrine. <u>Ibid.</u>

A unanimous Court determined the charges against the defendant, both "individually and in the aggregate, are within the category of 'minor' offenses held by the <u>Welsh</u> Court to be insufficient to establish exigent circumstances justifying a warrantless home entry." <u>Id.</u> at 597. The Court explained that, "[a]lthough the State argues that citizens should not be encouraged to elude arrest by retreating into their homes, the question whether hot pursuit by police justifies a warrantless entry depends on the attendant circumstances." <u>Ibid.</u> The Court ultimately determined there was no "serious threat to public safety in the course of" the officer's pursuit of Bolte sufficient to justify entry into his home. <u>Id.</u> at 598. However, the Court found that "if the threat to public

safety is substantial, the 'hot pursuit' of a defendant who poses a threat to public safety may in certain contexts constitute an exigent circumstance sufficient to support a warrantless home entry under current United States Supreme Court decisions." Ibid.

In Jones, two police officers from the Narcotics Street Crime Unit were conducting surveillance near a parking lot of an apartment complex. 143 N.J. at 8. During the surveillance, the officers noticed "a vehicle containing [the] defendant and a companion . . . pull into the parking lot." Ibid. One of the officers identified the companion as Lonzie Collier; that officer also remembered seeing an outstanding warrant for Collier's arrest. Ibid. At the time the officers decided to approach Collier and Jones, the officer who recalled the outstanding warrant "did not know the offenses underlying the issuance of the warrant." Ibid.

When the officers approached the car, Collier and Jones fled into the apartment building. Id. at 8-9. Similar to what occurred here with Bell and Bookman, Collier and Jones "entered the apartment building with the two police officers not far behind. Collier and [the] defendant ran up the stairs and quickly entered apartment 312." Id. at 9.

When the two police officers reached apartment 312, they found the door locked and kicked it down. Ibid. On top of the kitchen table, the officers

20

found "narcotics paraphernalia," a series of documents and the driver's license, social security card, bank card, and vehicle registration of the owner of the car that was burglarized two days earlier in a nearby parking lot; the officers also found and seized a crowbar wrapped in newspaper.  Ibid.  The officers arrested Collier and Jones based on that evidence.

The officers later discovered Collier's arrest warrant was for "failure to pay fines assessed for two prior convictions of possession of narcotics and paraphernalia."  Id. at 8.  This Court held that

> [i]n view of the significance that attaches to the issuance of a warrant and the fact that "every arrest, regardless of the nature of the offense [may] present a risk of danger to an officer," to require police officers to distinguish between arrest warrants issued for minor and serious offenses would be unreasonable.
>
> [Id. at 17 (second alteration in original) (quoting State v. Bruzzese, 94 N.J. 210, 233 (1983)).]

As the Court explained, requiring police officers to know the offense underlying every arrest warrant, "and then whether or not a given offense is a 'minor' one, unjustifiably interferes with the execution of a principal and traditional police function, namely to arrest individuals wanted on outstanding warrants."  Ibid.  Finally, the Court noted the guiding principle must be whether officers acted in an objectively reasonable manner.  Id. at 19-20.

21

Under the totality of the circumstances, the Court found that the officers acted in an objectively reasonable manner in this situation.  Id. at 20.

In 2018, this Court discussed at length the principles established in Bolte in a case where the police attempted to justify the warrantless entry of a home relying on the hot pursuit doctrine.  In J.A., a juvenile attacked a man at a bus stop and stole his phone.  233 N.J. at 438.  Shortly thereafter, a police officer "tracked the phone's location to a nearby house using a phone tracking application."  Ibid.  When the police officers arrived at the residence, one of the officers "spotted the stolen phone's case through a window."  Ibid.  When no one responded after the officers knocked on the door, "the officers entered the house through an unlocked window."  Ibid.

This Court found that neither hot pursuit nor any other exigent circumstances applied because the police had no "basis to believe that defendant would injure anyone inside the house or the officers themselves, [such] that waiting to obtain a warrant would have been unreasonable."  Id. at 451.  The Court further explained that there was no reason to believe the defendant would destroy the phone.  Ibid.  In reaching that conclusion, the Court relied on the principles endorsed in Bolte.  Id. at 450-51.

Against this analytical backdrop, and considering the totality of the circumstances presented here, we now hold the State Police officers were not entitled to enter the 1237 Thurman Street residence under the hot pursuit doctrine. The officers did not act in an objectively reasonable manner when they chose to execute a four-month-old ATS warrant for Bell's failure to appear in response to a Title 39 violation at 1:00 a.m. Although police officers are permitted to enter the subject of an arrest warrant's home when they have reason to believe the subject is inside, Brown, 205 N.J. at 145, this rule does not extend to third-party homes. Moreover, the municipal court that issued the ATS warrant only authorized Bell's arrest and the entry of his home, if necessary. The warrant did not authorize officers to pursue Bookman into 1237 Thurman Street. Because the State Police did not have any information that Bookman was involved in any criminal activity, Bookman's decision to run from the scene did not constitute grounds to invoke the hot pursuit doctrine.

In this case, the officers knew that the ATS warrant was for a minor traffic offense and had no reason to suspect there was any risk of danger or destruction of evidence relevant to that warrant that may have justified a hot pursuit. See J.A., 233 N.J. at 451. This Court has characterized the "sanctity

23

of one's home" as "among our most cherished rights."  Vargas, 213 N.J. at 313 (quoting State v. Frankel, 179 N.J. 586, 611 (2004)); see also U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7.  Invocation of the hot pursuit doctrine under these circumstances is a weak attempt to justify this violation of one of our most cherished constitutional rights.

Here, the Appellate Division's reliance on Jones to uphold the State Police's warrantless entry of 1237 Thurman Street based on the hot pursuit doctrine is misplaced because Jones focused on the impracticality of requiring officers to learn the nature of an underlying offense.  Further unlike Jones, where the officers encountered the defendant while engaging in unrelated surveillance, the State Police here encountered Bell and Bookman based on a planned execution of the ATS warrant at 1:00 a.m., four months after it was issued.  See Jones, 143 N.J. at 8.

These distinctions highlight the fact that any exigency here was a direct result of the officers' decision to unreasonably execute the ATS warrant.  It is well established that officers may not rely on exigencies they create -- i.e., that would not have existed but for the officers' unreasonable time, place, and manner of a warrant's execution -- to bootstrap an otherwise unconstitutional action.  See State v. Hutchins, 116 N.J. 457, 468, 475-76 (1989) (collecting

24

cases and acknowledging "the potential for abuse inherent in the exigent-circumstance exception to the warrant requirement").

Although we are satisfied that the facts of this case do not establish grounds to invoke the hot pursuit doctrine, we are also compelled to address the manner in which this ATS warrant was executed. Officers testified that Bell "was a suspect of [a] stolen motorcycle investigation -- and we were looking for him for those charges that we were going to arrest him on. . . . [W]e knew that he had an outstanding ATS warrant."[2] This testimony elucidates that the warrant execution was intended to apprehend Bell for matters wholly unrelated to the Title 39 infraction. We cannot endorse this manipulation of a judicial warrant.

The municipal court issued this ATS warrant for Bell's failure to appear in response to a Title 39 violation. Four months appear to have passed with no action taken to make the arrest authorized by the warrant. Yet the record shows the tactical approach the police deployed was akin to the execution of a high-risk, no-knock warrant. The leader of the State Police action team: (1) selected an unreasonable time of the day to execute the warrant (1:00 a.m. in a

_____

[2] The leader of this State Police investigation also testified about an unknown individual who claimed to have seen Bell engaged in a hand-to-hand transaction of suspected crack cocaine earlier that day. The State Police did not make any effort to seek an arrest warrant on this basis.

25

residential neighborhood); (2) deployed an unreasonable number of officers -- eight -- to execute the traffic warrant arrest; (3) unreasonably pursued Bookman, a man who was neither named on the ATS warrant nor suspected of being involved in any criminal activity; and (4) unreasonably entered the home of a third party without a warrant while pursuing Bookman and Bell. Once again, we note that law enforcement officers cannot create the exigencies they later use to undermine the "sanctity of one's home." Frankel, 179 N.J. at 611.

Here, the State failed to meet its burden to prove that the officers' actions were objectively reasonable under the hot pursuit doctrine. The record contains insufficient evidence of any circumstance justifying the hot pursuit of a suspect -- imminent threat of harm or destruction of evidence -- were present here. See J.A., 233 N.J. at 449-50; see also Vargas, 213 N.J. at 324 n.9.

Further, we reject the State's unsubstantiated claim that this was a "high crime area" to justify the pursuit, search, and detention of defendant. During the N.J.R.E. 104 hearing conducted by the trial judge to adjudicate Bookman's motion to suppress, the subject of "high crime area" was generally referenced and mentioned only briefly.

This Court recently considered whether to reject the presence of a defendant in an alleged "high crime area" as a factor, under the totality of the circumstances, to determine whether there is reasonable and articulable

suspicion to detain a person and conduct an investigatory stop. State v.

Goldsmith, ___ N.J. ___, ___ (2022) (slip op. at 23-25). Although we declined

to "abandon presence in a high-crime area as a factor in determining whether

reasonable and articulable suspicion exists," we reaffirmed that

> just because crime is prevalent in a particular area "does not mean that residents in those areas have lesser constitutional protection from random stops." Law-abiding citizens who live and work in high-crime areas undoubtedly want law enforcement to be able to fully execute their duties and protect their communities; at the same time, however, those individuals likely do not want the necessary policing of their neighborhoods to occur at the expense of their own constitutional rights of privacy and freedom.
>
> [Id. at ___ (slip op. at 24) (quoting State v. Shaw, 213 N.J. 398, 420 (2012)).]

Here, we reject the State's invocation of "high crime area" as a relevant

factor. First, the State did not present competent evidence illustrating that the

relevant area was in fact within a "high crime area." See id. at ___ (slip op. at

31) ("The State must do more than simply invoke the buzz words 'high-crime

area' in a conclusory manner to justify investigative stops."). Further, the

police went to this area specifically because they knew Bell would be there

and, therefore, the unsubstantiated and pretextual assertion that this may have

been a "high crime area" cannot be used as the basis to justify an otherwise

unlawful pursuit, search, and detention of Bookman.

27

Under the totality of the circumstances reviewed here, we hold the State Police detectives who entered the 1237 Thurman Street residence without a warrant did not have grounds to invoke the hot pursuit doctrine. The warrantless entry of this residence violated the Fourth Amendment of our national Constitution and Article I, Paragraph 7 of our state's Constitution.

## IV.

We therefore reverse the Appellate Division's judgment, suppress the handgun defendant carried on his person on November 2, 2017, and vacate his conviction for second-degree unlawful possession of a handgun under N.J.S.A. 2C:39-7(b).


CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, and PIERRE-LOUIS join in JUDGE FUENTES's opinion.